No. 95–73. CARGILL, INC. *v.* UNITED STATES. C. A. 9th Cir. Certiorari denied.

JUSTICE THOMAS, dissenting.

This case questions whether the Army Corps of Engineers (Corps) can, under the Clean Water Act, constitutionally assert jurisdiction over private property based solely on the actual or

potential presence of migratory birds that cross state lines. I dissent from the denial of certiorari in this case.

Petitioner, the successor in interest to Leslie Salt Company, owns a 153-acre tract of land southeast of San Francisco. Across the highway is the San Francisco Bay National Wildlife Refuge, which was created when the United States condemned land previously owned by petitioner. In approximately 1919, the predecessor of Leslie Salt began manufacturing salt on the property. To facilitate salt production, Leslie Salt dug pits on dry ground to collect calcium chloride and dug shallow basins to crystallize salt. These basins lie on approximately 12.5 acres of the tract. Leslie Salt discontinued salt production in 1959.[1] Since then, the area has been dry most of the year, but, during the winter and spring, rainwater occasionally creates temporary ponds. In 1985, Leslie Salt began digging a feeder ditch and a siltation pond on its property and began discharging fill material that affected the basins. After learning of Leslie Salt's activities, the Corps issued a cease-and-desist order under the Clean Water Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.* (1988 ed.). Leslie Salt filed suit challenging the Corps' jurisdiction over its property.

The United States District Court for the Northern District of California originally found that the Corps lacked jurisdiction over the land, but the Court of Appeals for the Ninth Circuit reversed and remanded for a determination whether the presence of migratory birds created a sufficient connection to interstate commerce to sustain Corps jurisdiction. *Leslie Salt Co.* v. *United States,* 896 F. 2d 354 (1990), cert. denied, 498 U. S. 1126 (1991). On remand, the District Court held that the presence of migratory birds on the property did create a sufficient connection to interstate commerce to permit Corps regulation, and the Court of Appeals affirmed. *Leslie Salt Co.* v. *United States,* 55 F. 3d 1388 (CA9 1995). Petitioner seeks review of this ruling. I would grant certiorari to resolve whether the potential or occasional

---

[1] After 1959, the crystallizing basins remained generally void of vegetation due to the compaction and high salinity of the soil. The dry and barren condition of the basins created a dust problem, and, as a result, Leslie Salt was cited for air pollution violations. To prevent further citations, Leslie Salt subsequently plowed the basins in 1983 and 1985 to loosen the soil and create conditions more hospitable to plant growth. Ironically, Leslie Salt's actions to avoid citation for air pollution helped create the conditions that later subjected it to penalties under the Clean Water Act.

existence of migratory birds on petitioner's property creates a sufficient nexus with interstate commerce to permit Corps regulation of these lands.

The Clean Water Act prohibits the discharge of any "pollutant"—including dredged or fill materials—into "navigable waters" without a permit from the Corps. 33 U. S. C. §§ 1311(a), 1344(a), 1362(12). "Navigable waters" are defined in the Clean Water Act as "waters of the United States." § 1362(7). The Clean Water Act does not further define the waters to which Corps jurisdiction extends. Instead, the Corps has promulgated regulations defining the "waters of the United States" as:

> "(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

> "(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce . . . ." 33 CFR § 328.3(a) (1995).

In the preamble to regulations promulgated in 1986, the Corps further suggested that "waters of the United States" includes waters:

> "a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or
> "b. Which are or would be used as habitat by other migratory birds which cross state lines . . . ." 51 Fed. Reg. 41217.[2]

Only last Term, we held that possession of a firearm in a local school zone does not substantially affect interstate commerce. *United States* v. *Lopez,* 514 U. S. 549 (1995). The basis asserted to create federal jurisdiction over petitioner's land in this case

---

[2] These regulations presumptively exclude "settling basins" from the Corps' definition of "waters of the United States." 51 Fed. Reg. 41217 (1986). I find it strange that Leslie Salt could have filled in its settling ponds without Corps regulation if it had still been using them in salt production, but cannot now that it has abandoned the production of salt.

seems to me to be even more farfetched than that offered, and rejected, in *Lopez*. At least in *Lopez* the Government could assert that the presence of weapons in and around schools may result in violent crime that affects education and, hence, the economy. See *id.*, at 563–564. In this case, the Corps' basis for jurisdiction rests entirely on the actual or potential presence of migratory birds on petitioner's land. In light of *Lopez*, I have serious doubts about the propriety of the Corps' assertion of jurisdiction over petitioner's land in this case.

It is undisputed that the occasional rainwater ponds at issue in this case have never been, are not now, and probably will never be susceptible to use in interstate or foreign commerce. The "other waters" provision of 33 CFR § 328.3(a)(3) (1995) does not require that an activity substantially affect interstate commerce, only that the activity *"could* affect interstate or foreign commerce." (Emphasis added.) In keeping with the "could affect" test, the so-called "migratory bird rule" extends the Corps' regulatory jurisdiction over any waters that might serve as a potential habitat for "migratory birds which cross state lines." 51 Fed. Reg. 41217 (1986).

Apparently, the Corps' regulations are based on the assumption, improper in my opinion, that the self-propelled flight of birds across state lines creates a sufficient interstate nexus to justify the Corps' assertion of jurisdiction over any standing water that could serve as a habitat for migratory birds. As the Court of Appeals admitted, the Corps' expansive interpretation of its regulatory powers under the Clean Water Act may test the very "bounds of reason," 55 F. 3d, at 1396, and, in my mind, likely stretches Congress' Commerce Clause powers beyond the breaking point.

This case is not like *Andrus* v. *Allard*, 444 U. S. 51 (1979), relied on by the Government, which upheld a ban on the sale of bald or golden eagles or any part thereof. The eagle feathers at issue in *Allard* were actually items of interstate commerce, not simply airborne interstate travelers. *Id.*, at 54. Similarly misplaced is the Court of Appeals' reliance on *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979), a case involving interstate transportation of minnows for commercial purposes.

Both the Court of Appeals and the Government rely on the Seventh Circuit's declaration of an interstate nexus in *Hoffman Homes, Inc.* v. *EPA*, 999 F. 2d 256, 261 (1993): "Throughout North

America, millions of people annually spend more than a billion dollars on hunting, trapping, and observing migratory birds." That is no doubt true, and I do not challenge Congress' power to preserve migratory birds and their habitat through legitimate means. However, that substantial interstate commerce depends on the continued existence of migratory birds does not give the Corps *carte blanche* authority to regulate every property that migratory birds use or could use as habitat. The point of *Lopez* was to explain that the activity on the land to be regulated must substantially affect interstate commerce before Congress can regulate it pursuant to its Commerce Clause power.

The record in this case demonstrates that migratory birds do visit petitioner's seasonal rainwater ponds. But there was no showing that humans ever went to petitioner's property to hunt, trap, or observe migratory birds. Indeed, as far as the record reveals, the only persons ever to visit petitioner's property in connection with migratory birds were the Government's experts. The record further suggests that the habitat itself was the product of industrial land use and that petitioner's attempts to remedy air pollution violations made the temporary ponds more hospitable to migratory birds. There was no indication that petitioner's activities would harm any birds or affect the wildlife refuge across the road.

Other than the occasional presence of migratory birds, there was no showing that petitioner's land use would have any effect on interstate commerce, much less a substantial effect. Nor was there any showing that the cumulative effect of land use involving seasonal standing water—water that is wholly isolated from any water used, or usable, in interstate commerce—would have a substantial effect on interstate commerce.

This case raises serious and important constitutional questions about the limits of federal land-use regulation in the name of the Clean Water Act that provide a compelling reason to grant certiorari in this case. These questions were left open in *United States v. Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985), and should now be resolved.

I respectfully dissent.