**UNITED STATES of America,**
**Plaintiff,**

v.

**Mitch BUDAY, Defendant.**

**No. CR 00–19–BU–DWM.**

United States District Court,
D. Montana,
Butte Division.

April 11, 2001.

W. Keith Goody, Attorney at Law, Jackson, WY, for Mitch Buday defendant.

Kris A. McLean, Office of the U.S. Attorney, Missoula, MT, for plaintiff.

ORDER

MOLLOY, Chief Judge.

## I. Factual & Procedural Background

Fred Burr Creek wends its way through a small segment of southwestern Montana. "Creek" is a seasonal misnomer; during spring runoff, Fred Burr Creek thunders through its broad valley at a deafening roar. *See* Gov't Ex. 8 (videotape). The Creek is too wide to jump across, up to 20 or 30 feet wide in some locations, and approximately six inches to two or three feet deep, depending on location and time of year. *See* Transcript of Hearing, March 29–30, 2001 ("Tr."), at 19, 54, 67. While its level of flow varies, there is always water in the Creek. Tr. at 54–55, 57, 60.[1]

Fred Burr Creek once sustained a population of several hundred people. Tr. at 16–17, 68–69. In the late 1880's, the Creek powered the Rumsey Mill, which was in operation for only a few years, Tr. at 72–73, and also supplied water for the townsfolk and for tailings ponds. Fred Burr Creek was also diverted to assist in powering two other mills—the Granite Mill and the Bimetallic Mill—in the next drainage over from its native bed. Tr. at 69; Def. Ex. 506. The Creek destroyed the tailings ponds in its own drainage in the flood of 1908, pushing 20,000 to 40,000 tons of debris downstream to Flint Creek. Tr. at 67. Tailings from other mining camps—the Londonderry Mill and the Moonlight Mine, in addition to the Bimetallic and Granite mills—probably also washed into Flint Creek in that year. *See* Def. Ex. 506. Flint Creek flows into the Clark Fork River. The Clark Fork carried a tremendous volume of debris downstream from the Butte mines. Tr. at 89, 90.

Today, at Milltown, Montana, impounded behind the first dam on the Clark Fork, lie more—by some estimates, a lot more—than 6 million tons of heavy metals debris. Tr. at 104. Arsenic and mercury are two of the principal and most dangerous contaminants that now lie behind the dam. Tr. at 91. Some estimates place Flint Creek's contribution to the total tonnage of toxic waste in the Clark Fork at Milltown Dam at 43%. Tr. at 103.

Roughly 190 miles downstream,[2] at the town of Clark Fork, Idaho, just across the Montana border, the Clark Fork River is navigable-in-fact,[3] a few miles above the point where the River flows into Pend Oreille Lake. Gov't Ex. 7 (Army Corps of Engineers report on navigability), at ¶¶ 3,

---

1. Eric Smart testified that he believes that Fred Burr Creek dips underground at its lowest level of flow, so that surface flow is not apparent. Tr. at 100–101. Smart observed the Creek only in March of 2001 and projected hyporeic flow based on his observation of other, similar creeks. The ranchers who testified on behalf of the Government opined, based on their lifelong observations of the creek, that it "continues to flow" and never goes dry. Tr. at 54–55, 57, 60. Smart reconciled this discrepancy by saying that the ranchers accurately report the creek's characteristics where they observe it and his observations are correct elsewhere on the creek. Tr. at 101. I find nearly one-half a century of observation by ranchers in the area is more credible than Mr. Smart's observation for the purposes of litigation in this case.

2. This is a rough estimate, based on the Army Corps of Engineers' finding that Dixon is 122 miles from Pend Oreille Lake. Gov't Ex. 7, at ¶ 7. No figure was given at the hearing.

3. A waterway is "navigable-in-fact" if a study has been done to determine that it can handle a certain amount and type of traffic. A "navigable" waterway is one that can support small boats, kayaks, canoes, or similar conveyances. Tr. at 48–49.

8. Emerging from the Lake,[4] the Clark Fork flows north and west, meeting the Columbia River in northeastern Washington. The full proper name of the Clark Fork is "the Clark Fork of the Columbia River." *Id.* at ¶ 10. "Clark" is William Clark, Meriwether Lewis' traveling companion. *See, e.g., Journals of Lewis & Clark,* June 6, 1806 (entry of Captain Clark referring to "Clark River").

On August 11, 1996, Defendant Mitch Buday "used a bulldozer and an excavator to dig ponds" near Fred Burr Creek and "used the material to create berms" at the Mountain Valley subdivision site in Granite County, Montana. Change of Plea Transcript, Jan. 9, 2001, at 21. He knew he needed a permit from the Army Corps of Engineers. *Id.* at 23–24, 25. Fred Burr Creek runs through Mountain Valley, below the site of the old Rumsey Mill. Wetlands lie on either side of the Creek in that area. In the spring of 1997, Fred Burr Creek destroyed the berms, drained the ponds, scattered hay bales, dirt, and debris throughout the Valley, and pushed an unknown quantity of dirt and debris into Flint Creek. *See* Gov't Ex. 8.

It is extremely unlikely that any of the sediment dumped into Fred Burr Creek reached the Clark Fork at the time. Tr. at 97–98. The sediment would eventually reach the Pacific Ocean, if it were not blocked by dams or other artificial obstructions, but only in a "decade." Tr. at 103. Ranchers in the area reported, at the time the excavations began in 1996, that Fred Burr Creek was "running chocolate-milk colored." Tr. at 34–35.

Buday was indicted for Clean Water Act violations on October 17, 2000. On January 9, 2001, Buday pled guilty to an Information charging him with knowingly discharging pollutants, including dredge and fill material, "into navigable waters, including wetlands," in violation of the Clean Water Act (33 U.S.C. § 1311(a) and 1319(c)(2)(A)). At the plea colloquy, Buday and the Government were asked whether Fred Burr Creek is a "navigable water" within the meaning of the Clean Water Act. The parties agreed that it was.

Hours after Buday pled guilty, the United States Supreme Court decided *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). In that case, the Supreme Court held that seasonal ponds and wetlands, which were not adjacent to any navigable streams or tributaries and which lay entirely within one state's borders, could not be considered "navigable waters" within the meaning of the Clean Water Act solely because they were used as habitat by migratory birds. *Id.* at 680, 683–84.

In light of that case, the Court asked the parties to submit supplemental briefs on the following question: does the United States have jurisdiction to prosecute Mitch Buday? The briefs were submitted on January 26, 2001. Buday argued that *Solid Waste Agency* precluded federal jurisdiction over the offense to which he pled guilty. The Court construed Buday's brief as a motion to withdraw his guilty plea, pursuant to Fed.R.Crim.P. 32(e),[5] and

---

4. Some maps show this river as the Pend Oreille River, but it is commonly considered the Clark Fork. *See, e.g.,* Gov't Ex. 7, at ¶ 2.

5. Although Buday stated at the hearing that he brings a motion to dismiss for lack of jurisdiction, *see* Fed.R.Crim.P. 12(b)(2), he also invokes the rule of lenity. A motion to

withdraw a guilty plea can preserve all these issues. Should his imputed motion be denied, appellate review would be directed to the question whether the Court abused its discretion in denying his motion to withdraw his guilty plea. Because a legal error is always an abuse of discretion, *see Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035,

scheduled a hearing on the motion so construed for Thursday, March 29, at 9:00 a.m.

Currently pending before the Court are at least two other cases based, at least in part, on the same events. *See United States v. Larry Zinger*, CR 01–01–BU–DWM (Jan. 22, 2001); *United States v. David Phillips*, CR 01–07–BU–DWM (Mar. 7, 2001).

In this case, after considering all the evidence and arguments in light of *Solid Waste Agency*, I conclude the motion to withdraw should be denied. There is jurisdiction to prosecute this case in the United States District Court.

## II. Analysis

The briefs discuss whether the *wetlands* adjacent to Fred Burr Creek are "waters of the United States" within the meaning of the Clean Water Act. No one disputes that the sites in question are "wetlands," and no one disputes that they are adjacent to and empty into Fred Burr Creek.[6] Federal jurisdiction over wetlands is based on their being adjacent to "navigable waters." The real question here is whether Fred Burr Creek is a "navigable water" in the sense contemplated by Congress in the Clean Water Act.

Buday advances three arguments against federal jurisdiction. First, he contends that the statute does not extend federal jurisdiction to Fred Burr Creek and its environs. This argument is built on *Solid Waste;* in that case, the Supreme Court held that a regulation of the Army Corps of Engineers improperly expanded the agency's jurisdiction beyond the boundaries envisioned by Congress. Second, he argues that if Congress' intent is unclear, the statute must be narrowly construed to avoid constitutional difficulties that would be posed by the Government's proposed reading. Finally, in the event the Court finds that the Government correctly reads the statute, he invokes the Supreme Court's recent Commerce Clause jurisprudence to preclude the statute's extension to Fred Burr Creek.

The Government argues that Fred Burr Creek and the wetlands surrounding it fall squarely within interpretations of the Clean Water Act that predate *Solid Waste Agency* and that have been upheld by the Supreme Court in the past and, in dicta, even in *Solid Waste Agency*. I find the Government's position is persuasive on all issues.

### A. Did Congress intend to reach Fred Burr Creek?

■ Buday's first argument is that the Corps' regulation defining "navigable waters" exceeds the scope of Congress' intent, because Congress did not intend to extend its jurisdiction over waters so slight and remote as those that flow in Fred Burr Creek. Contrary to Buday's argument, courts have been virtually unanimous in deciding that creeks like Fred Burr fall within the scope of the federal Clean Water Act.

*1. The Clean Water Act and Interpretive Regulations*

Congress defines "navigable waters" as "waters of the United States." 33 U.S.C.

135 L.Ed.2d 392 (1996), both the jurisdictional issue and the lenity issue could be squarely presented. Should his imputed motion be granted, he could then bring a motion to dismiss, based on the same arguments underlying his motion to withdraw his plea, including the rule of lenity. Because his guilty plea has already been taken, this procedural path appears to best present and preserve all the issues raised in Buday's brief.

6. Buday was charged with discharging pollutants into "navigable waters, including wetlands." Either Fred Burr Creek itself or the wetlands could support the Information.

§ 1362(7). The Army Corps of Engineers defines "waters of the United States," in relevant part, as follows:

The term "waters of the United States" means

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters, including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce; ...

(5) Tributaries of waters identified in [subparagraphs (1), (2), and (3) ] of this section; ...

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in [subparagraphs (1), (2), (3), or (5) ] of this section.

33 C.F.R. § 328.3(a).

*2. The Migratory Bird Rule and Solid Waste Agency*

The "Migratory Bird Rule," which drew the Court's fire and ire in *Solid Waste Agency,* arises out of 33 C.F.R.

§ 328.3(a)(3)(i). Migratory birds are objects of interest to sportsmen, so their habitat, provided it is generally watery, is or could be "used by interstate or foreign travelers for recreational or other purposes" within the meaning of the Corps' interpretation of the Clean Water Act. The "Migratory Bird Rule" itself is found at 51 Fed.Reg. 41206, 41217 (Nov. 13, 1986). It was intended as a clarification of Part 328 of C.F.R. title 33:

A number of commenters appeared to have misinterpreted the intent of this part. Many thought we were trying to reduce the scope of jurisdiction while others believed we were trying to expand the scope of jurisdiction. Neither is the case. The purpose was to clarify the scope of the 404 program by defining the terms in accordance with the way the program is presently being conducted.

51 Fed.Reg. at 41217.

In determining whether this "clarification" conformed to Congress' intent in the Clean Water Act, the Court emphasized the rationale for Congress' Commerce Clause power over the "waters of the United States": their use or potential for use as channels of interstate or foreign *navigation.* "[I]t is the water body's capability of use by the public for purposes of transportation or commerce which is the determinative factor." 121 S.Ct. at 680 (quoting 33 C.F.R. § 209.260(e)(1)). *See also id.* n. 3 (noting that nothing in the legislative history "signifies that Congress intended to exert anything more than its commerce power *over navigation* " (emphasis added)). The Court struck the Migratory Bird Rule's "clarification" and its application as exceeding Congress' intent in 33 U.S.C. § 1362(7) because it premised Congress' power on the effects that a water body could have on interstate commerce. "We hold that 33 C.F.R. § 328.3(a)(3)

(1999), as clarified and applied to petitioner's balefill site pursuant to the 'Migratory Bird Rule,' 51 Fed.Reg. 41217 (1986), exceeds the authority granted to respondents under § 404(a) of the CWA [33 U.S.C. § 1344(a) ]." *Solid Waste Agency*, 121 S.Ct. at 684.

Even though the Court did *not* strike any part of 33 C.F.R. § 328.3(a)(3), the decision raises serious questions about the continued viability of that subsection. Assume Flathead Lake, for instance, is an entirely intrastate water and does not empty into any stream or river that crosses state lines.[7] Those characteristics would make it comparable to the ponds and wetlands that the Court considered in *Solid Waste Agency*. Presumably, the Corps of Engineers would believe Flathead Lake is subject to federal jurisdiction under subsection (a)(3)(i) and (ii) of the regulation, because it has a substantial connection with interstate commerce in the form of the numerous sportsmen who fish in the Lake. No doubt migratory birds also visit the Lake, and hunters come to Montana to hunt in the Flathead. By analogy, the Government would not have to prove, as an element of each criminal case concerning an illegal event at Flathead Lake, that sporting activities at the Lake have substantial impact on commerce between Montana and other states. *Cf. Solid Waste Agency*, 121 S.Ct. at 683 ("[A]s the Court of Appeals found, millions of people spend over a billion dollars annually on recreational pursuits relating to migratory birds.").[8]

But this Court need not solve these puzzles. 33 C.F.R. § 328.3(a)(3) is based on a different inflection of the theory of Congress' powers over the waters of the United States. Subsection (a)(3) focuses on the *effects* that "intrastate waters ... mudflats ... and prairie potholes" could have on interstate commerce, not on their use as *channels* for interstate commerce. *Cf. United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Congress may exert Commerce Clause

---

7. In fact, Flathead Lake empties into the Flathead River, which intersects the Clark Fork.

8. The Fourth Circuit has held that 33 C.F.R. § 328.3(a)(3) is invalid.

   This regulation purports to extend the coverage of the Clean Water Act to a variety of waters that are intrastate, nonnavigable, or both, solely on the basis that the use, degradation, or destruction of such waters *could* affect interstate commerce. The regulation requires neither that the regulated activity have a *substantial* effect on interstate commerce, nor that the covered waters have any sort of nexus with navigable, or even interstate, waters.

   *United States v. Wilson*, 133 F.3d 251, 257 (4th Cir.1997) (citing *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)) (plurality op.). Two judges concurred in this portion of the opinion. Judge Luttig concurred in the disposition but declined to invalidate the regulation on the grounds that the applicable Fourth Circuit precedent, *Brzonkala v. Virginia Polytechnic & State Univ.*, 132 F.3d 949 (4th Cir.1997), construed *Lopez* "as an aberration, essentially limiting the reach of that opinion to section 922(q), of Title 18, of the United States Code." Judge Luttig opined that the *Wilson* court could not resort to *Lopez* without going through *Brzonkala*, which it did not do. Therefore, he concluded, the *Wilson* court had no authority to interpret *Lopez* as a limitation on the Corps' jurisdiction. *See* 133 F.3d at 266.

   The plurality's reasoning was vindicated when *Brzonkala* was reheard en banc, 169 F.3d 820 (4th Cir.1999), and the panel's decision was replaced by a stronger reading of *Lopez*. That decision went up to the Supreme Court (No. 99–29) as a companion case to *United States v. Morrison*, No. 99–5. *See* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (affirming Fourth Circuit's en banc opinion and invalidating civil remedy provision of the Violence Against Women Act because provision did not regulate activity having a substantial impact on interstate commerce).

powers based on either channels, instrumentalities, or substantial effects). The other subsections of the same regulation focus on the use or potential use of water as a channel for interstate commerce, and the Supreme Court has found those subsections consistent with Congress' intent in the Clean Water Act and with the Commerce Clause. In short, those subsections relate directly to navigability, the absence of which concerned the Court in *Solid Waste Agency*.[9]

In this case, Fred Burr Creek and the wetlands surrounding it are not navigable-in-fact. Fred Burr Creek is probably navigable in stretches, but it is not generally used in that manner, because it is frequently too shallow and is blocked by irrigation weirs, fences, and other obstructions. Federal jurisdiction must be based on Fred Burr Creek's status as a tributary. Fred Burr Creek might be a tributary of a water that is or was navigable within the meaning of subsection (1), or, because the Clark Fork flows through Montana, Idaho, British Columbia and Washington, it might be a tributary of an interstate/international water within the meaning of subsection (2). Thus, the real question is whether Congress intended that Fred Burr Creek should be subject to its jurisdiction because it is a "tributary" of an interstate water or a water that is "currently used, or [was] used in the past,[10] or may be susceptible to use in

interstate or foreign commerce." 33 C.F.R. § 328.3(a)(5), (2), (1).

The following discussion assumes that the "navigable water" in question is the Clark Fork River, because it is both an interstate water and navigable-in-fact, as well as being navigable by canoe, boat, or kayak in long stretches. However, it is worth remembering that the Columbia River, a major channel for interstate commerce, is also implicated in the facts of this case.

### 3. "Tributaries that May Be Susceptible to Use in Interstate Commerce"

Strictly speaking, Fred Burr Creek is a tributary of a tributary of the Clark Fork River. Case law on "tributaries," dating from before *Solid Waste Agency*, leaves little doubt that Congress intended to reach waters like Fred Burr Creek and that its reach does not exceed its legitimate scope. In *United States v. Texas Pipe Line Co.*, 611 F.2d 345 (10th Cir. 1979), *cited in Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532–33 (9th Cir. 2001), the Tenth Circuit found that the Coast Guard had jurisdiction over an unnamed tributary of Caney Creek, which empties into Clear Boggy Creek, which empties into the Red River. Citing 33 U.S.C. § 1362(7), the court held that "Congress intended to extend the coverage of the [Federal Water Pollution Control] Act [33 U.S.C. § 1251 et seq.] as far as permissible under the Commerce Clause."[11] 611

---

9. The Court dismissed the Corps' last-minute argument that the effects of the landfill could ground federal jurisdiction under the Clean Water Act:

   [R]espondents now, *post litem motam*, focus upon the fact that the regulated activity is petitioner's municipal landfill, which is 'plainly of a commercial nature.' ... But this is a far cry, indeed, from the 'navigable waters' and 'waters of the United States' to which the statute by its terms extends.
   121 S.Ct. at 683.

10. The Clark Fork was indisputably used in the past as a vehicle for interstate or foreign commerce. *See, e.g.,* Gov't Ex. 7, ¶¶ 7, 8, 12, 13. This commerce was carried on downstream from Fred Burr Creek.

11. The 1977 Amendments to the Federal Water Pollution Control Act were named "the Clean Water Act." *See* Pub.L. No. 95–217, § 2, 91 Stat. 1566 (Dec. 27, 1977). 33 U.S.C. § 1362, where Congress defines "navigable waters," predated and survived the 1977

F.2d at 347. Thus, activities impinging on the unnamed tributary of a tributary of a tributary to the Red River were subject to federal jurisdiction.

Similarly, in *United States v. Eidson,* 108 F.3d 1336 (11th Cir.1997), *cited in Headwaters, Inc.,* 243 F.3d at 532, the court reasoned that "It is by now well established that Congress intended to regulate the discharge of pollutants into all waters that may eventually lead to waters affecting interstate commerce." 108 F.3d at 1341. Persons who discharged pollutants into a storm drainage ditch, where water flowed only intermittently, were subject to criminal penalties under the Clean Water Act. "[A]s long as the tributary would flow into the navigable body of water 'during significant rainfall,' it is capable of spreading environmental damage and is thus a 'water of the United States' under the Act." *Id.* at 1342 (quoting *Texas Pipe Line,* 611 F.2d at 347, and citing *Quivira Mining Co. v. United States Environmental Protection Agency,* 765 F.2d 126, 130 (10th Cir.1985)).[12] In *Eidson,* the storm drainage ditch emptied into a drainage canal which emptied into Picnic Island Creek, a tributary of Tampa Bay. *Id.* Again, a tributary of a tributary of a tributary of a water that was navigable-in-fact was subject to federal jurisdiction.

Finally, in *United States v. Ashland Oil & Transp. Co.,* 504 F.2d 1317 (6th Cir. 1974), which is widely cited, a company was federally indicted for failing immediately to report an oil spill into Little Cypress Creek. The Indictment was upheld by the Sixth Circuit. Little Cypress Creek flowed into Cypress Creek, which flowed into the Pond River, which flowed into the Green River. *Id.* at 1320, 1325.

None of these cases discuss the distance from the tributary in question to the navigable water or the point at which the concededly navigable water became navigable-in-fact. The stipulated facts in *Ashland Oil* included a statement that the Green River was navigable-in-fact at the point where the Pond River flowed into it. However, the court found that fact unimportant. *Id.* at 1326–28. It also held that the Government need not establish jurisdiction by proving that the pollutant actually reached the navigable water. *Id.* at 1329, *cited in Headwaters, Inc.,* 243 F.3d at 534.

These cases indicate that any polluting activity is subject to federal jurisdiction if it impinges on any stream that flows primarily over the surface of the land[13] and empties into a water that is at some point navigable-in-fact. Moreover, in *U.S. v. Riverside Bayview Homes,* the Supreme Court emphasized "the breadth of federal regulatory authority contemplated by the Act itself" as a reason to defer to implementing agencies' ecological judgment in defining areas subject to their jurisdiction. *See* 474 U.S. at 134, 106 S.Ct. 455, 88 L.Ed.2d 419; *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (deferring to reasonable administrative interpretations of silent or ambiguous federal statutes); *N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 506, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (requiring a clear indi-

---

amendments. Thus, *Texas Pipe Line* concerns the same statutes that are at stake in this case.

**12.** *See also Driscoll v. Adams,* 181 F.3d 1285 (11th Cir.1999), *cert. denied,* 529 U.S. 1108, 120 S.Ct. 1961, 146 L.Ed.2d 793 (2000) (citing *Eidson* and holding that an intermittently flowing tributary of a tributary of the Tennessee River was subject to federal jurisdiction).

**13.** Subterranean streams and ground waters are not involved in the facts of this case and will not be discussed.

cation that Congress intended to extend authority to constitutional limits).

In *Riverside Bayview,* the Court endorsed the Corps' explanation of its inclusion of wetlands in "waters of the United States":

> The regulation of activities that cause water pollution cannot rely on ... artificial lines ... but must focus on all waters that together form the entire aquatic system. Water moves in hydrologic cycles, and the pollution of this part of the aquatic system ... will affect the water quality of the other waters within that aquatic system.

474 U.S. at 133–34, 106 S.Ct. 455. Using this reasoning, it makes sense to believe that Congress intended to subject Fred Burr Creek to federal jurisdiction, because the Creek affects[14] the overall health of the Clark Fork River and, ultimately, the Columbia River.

As for legislative history, the Senate Conference Report on the Clean Water Act, S. Conf. Rep. No. 1236, 92d Cong., 2d Sess. 144, 1972 U.S.C.C.A.N. 3668, and the House Report, H.R.Rep. No. 911, 92d Cong., 2d Sess. 131, both state that "the conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation." Representative Dingell, who is frequently quoted in these cases, commented that "it is enough that the waterway serves as a link in the chain of commerce among the States as it flows in the various channels of transportation—highways, railroads, air traffic, radio and postal communication, waterways, et cetera," *quoted in Ashland Oil,*

504 F.2d at 1325; *see also* 118 Cong. Rec. 33756–33757 (1972).

The legislative history, in combination with the cases cited, establishes that Congress intended the Clean Water Act to reach any surface water that contributes to a water that is navigable-in-fact.

*4. The View from the Other Side of the Creek*

Two factors counter this interpretation of Congress' intent. First, *Riverside Bayview Homes* only went so far as to say that "Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate *at least some* waters that would not be deemed 'navigable' under the classical understanding of the term." 474 U.S. at 133, 106 S.Ct. 455 (emphasis added). The wetlands at issue in that case "actually abut[ted] on a navigable waterway." *Id.* at 135. The Court did not explain how "navigable" the abutting waterway was—it could have been "term-of-art" navigable, like the Clark Fork River in Montana, or it could have been navigable-in-fact, like the Clark Fork River at the Idaho border. Representative Dingell, who is so frequently quoted as if his comments are decisive, also said:

> The new and broader definition is more in line with more recent judicial opinions which have substantially expanded that limited view of navigability—derived from the Daniel Ball case—to include waterways which would be *"susceptible of being used ... with reasonable improvement,"* as well as those waterways

---

**14.** Fred Burr Creek's "effect" on the Clark Fork was estimated at some significant portion of 43% of "lots more" than 6 million tons of the toxic mine tailings that lie behind Milltown Dam. 43% of the contaminants at the Milltown Dam came from Flint Creek. Tr. at

103. Fred Burr Creek played a role in at least three of the five mining areas that contributed to Flint Creek: the Rumsey Mill, the Granite Mill, and the Bimetallic Mill. *See* Tr. at 67, 69; Def. Ex. 506.

which include sections presently obstructed by falls, rapids, sand bars, currents, floating debris, et cetera.

*Quoted in Ashland Oil,* 504 F.2d at 1323 (internal citation omitted) (emphasis added). The Clark Fork River is navigable in some places. It is presently obstructed by dams, falls, rapids, and sand bars. With improvements such as narrowing and deepening, its navigational utility could be enhanced. The Clark Fork is just the sort of waterway that Representative Dingell was talking about. But Fred Burr Creek, even with unreasonable improvement, could hardly be made navigable itself. If it is subject to federal jurisdiction, as discussed above, it can only be so as a tributary. This Court has not been alerted to any Supreme Court decision recognizing federal jurisdiction over tributaries of navigable waters. Nor has it found any.

Second, although case law from the Circuit Courts of Appeals strongly suggests that tributaries thrice-removed from navigable waters fall under federal jurisdiction, the cases seem to feature waters that are geographically relatively near an indisputably navigable water. For instance, in *Eidson,* decided in 1997, the storm drainage ditch at issue was probably in the same county as Tampa Bay, or at least in an adjacent county; the court named the *streets* that the water crossed before it intersected the Bay.

Distance seems to be the most compelling reason to distinguish Fred Burr Creek from other tributaries that have been found to be subject to federal jurisdiction. The Clark Fork arises in Montana and runs for about 350 miles within the state. *See* Gov't Ex. 7, at ¶ 3. Fred Burr Creek is roughly 15–20 miles long and lies entirely within Granite County. *See* Def. Ex. 505. Flint Creek lies entirely within Montana and extends about 30 miles. *Id.* From the Mountain Valley subdivision to the Clark Fork, it is about 35–40 miles. Tr. at 50–51. As a very rough estimate, it is probably another 190 miles to the point where the Clark Fork is indisputably navigable-in-fact.

But the relative scarcity of Western waters that are navigable-in-fact and the distances that waters travel in Montana and the West do not provide solid ground on which to build distinctions of federal vs. state or local jurisdiction. *Riverside Bayview Homes* implicitly recognized this problem:

> In view of the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable waters, the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act.

474 U.S. at 134, 106 S.Ct. 455.

By extension, just as wetlands adjacent to navigable waters fall under the Act, tributaries that are distant from but connected to navigable waters are ecologically capable of undermining the quality of the navigable water. The potential for harm to the navigable waterway is compounded when water is scarcer and when drainage is concentrated into relatively fewer navigable waterways. Here there is no question that toxic wastes dumped in Fred Burr Creek are part of the waste dump held in the waters of the Clark Fork River at Bonner. Though the configuration of the waters that Congress must protect is not uniform, Congress' interest in safeguarding navigable waters is uniform throughout the nation. The water quality of tributaries like Fred Burr Creek, distant though the tributaries may be from navigable streams, is vital to the quality of

navigable waters. Therefore, Congress must have intended to reach them.

*5. Conclusion: Congress Intended to Reach Fred Burr Creek*

Notwithstanding questions about this body of precedent, the cases must be read to indicate that Congress intended the Clean Water Act to apply to the likes of Fred Burr Creek and the wetlands surrounding it. Buday's first argument—that Congress did not intend to reach Fred Burr Creek—is rejected. The second and third arguments call into question the constitutionality of Congress' reach and are addressed together.[15]

**B. May Congress reach Fred Burr Creek?**

During the debate surrounding the passage of the Clean Water Act, Representative Dingell sketched out its constitutional background:

> The U.S. Constitution contains no mention of navigable waters. The authority of Congress over navigable waters is based on the Constitution's grant to Congress of "Power ... To regulate commerce with Foreign Nations and among the several States ..." (art. I, sec. 8, clause 3). *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23) (1824).

*Quoted in Ashland Oil,* 504 F.2d at 1323.

In view of Congress' intent to protect navigable waters to the full extent of its Commerce Clause powers, and in view of this Court's determination that Congress intended to protect Fred Burr Creek, the question of whether the Supreme Court's Commerce Clause jurisprudence would preclude Congress from reaching the Creek must be answered.

The Commerce Clause, as explicated by the Supreme Court in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), authorizes Congress to regulate "three broad categories of activity." *Id.* at 558, 115 S.Ct. 1624. First, "Congress may regulate the use of the channels of interstate commerce." *Id.* Second, "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons and things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* Third, "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *Id.* at 558–59, 115 S.Ct. 1624.

Under the facts of this case, the Clean Water Act passes constitutional muster under the first prong, use of the channels of interstate commerce. The Clark Fork is a channel or potential channel for interstate commerce.

Even under the infamous third prong of the test,[16] Fred Burr Creek is a legitimate object of federal jurisdiction because the Clean Water Act is part of a comprehensive scheme of federal regulation. *Lopez* distinguished 18 U.S.C. § 922(q), which prohibited carrying a gun in a school zone, from Congressional acts "regulating intrastate activity where we have concluded that the activity substantially affected in-

---

**15.** If consideration of the constitutional question suggests that there is no constitutional bar to federal jurisdiction, there is no need to construe the statute or regulation in such a way as to prune back any potential overreaching. Thus, Buday's second argument might be resolved by his third.

**16.** Buday states "[t]here can be no contention that the first two categories apply in this case." Def. Br. at 6–7. On the contrary, the word "channels," as used in *Lopez,* metaphorically extends a word primarily associated with navigation, the fount of Congress' exercise of its powers in the Clean Water Act, as discussed above.

terstate commerce." *Id.* at 559, 115 S.Ct. 1624. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560, 115 S.Ct. 1624.

Buday does not argue, and *Solid Waste Agency* does not suggest, that federal legislation cannot regulate the quality of waters that flow across state lines and that are substantially involved in interstate commerce. In *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), a farmer who grew his own wheat for his own consumption and seed was held to be subject to federal regulation because the wheat he did *not* introduce into interstate commerce had a substantial effect on interstate commerce.[17] On the model of *Wickard,* "although [Fred Burr Creek's] own contribution to the [waters of the United States] may have been trivial by itself, that [is] not 'enough to remove [it] from the scope of federal regulation where, as here, [its] contribution, taken together with that of many others similarly situated, is far from trivial.'" *Lopez,* 514 U.S. at 556, 115 S.Ct. 1624 (quoting *Wickard,* 317 U.S. at 127–28, 63 S.Ct. 82). Any activity that diminishes, increases, or pollutes the waters of Fred Burr Creek, though the water or the pollutant may be trivial in itself, is far from trivial when it is considered in connection with all the other, similarly slight and remote streams and creeks that contribute to the main waterways of the nation. Furthermore, I would not characterize what happened here as trivial in any sense of the law.

Moreover, the polluting activity to which Buday pled guilty is the very activity that Congress sought to regulate in the Clean Water Act. Buday was charged with violating 33 U.S.C. § 1311(a). It states that "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1344 authorizes the Secretary of the Army to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." The charge against Buday is in the heartland of the activities Congress intended to prohibit. *Compare, e.g., Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (prohibiting federal prosecution under the Hobbs Act of a defendant who set fire to an owner-occupied residence on the grounds that a private residence is not "property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" within meaning of 18 U.S.C. § 844(i)).

The cases cited by Buday are distinguishable. In *Cargill, Inc. v. United States,* 516 U.S. 955, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995), Justice Thomas dissented from the Court's denial of certiorari on the grounds that jurisdiction was based on the Migratory Bird Rule, a rule he believed too tenuous to sustain federal jurisdiction. Events have proven him correct, but, as discussed above, this case does not concern the Migratory Bird Rule or even 33 C.F.R. § 328.3(a)(3). Fred Burr Creek is a tributary of a navigable water. As such, many courts have already held that regulation of waters like it is within the power of Congress. *Leslie Salt*

---

**17.** The Migratory Bird Rule probably runs afoul of *Wickard.* The waters at issue in *Solid Waste Agency* were not "withheld" from interstate commerce for the purpose of avoiding interstate commerce, as the farmer's commodity was in *Wickard.* The connection among the waters, on the one hand, and the birds and hunters traveling across state lines, on the other, was significantly more tenuous than the deliberate squirreling away of wheat in *Wickard.*

*Co. v. United States*, 55 F.3d 1388 (9th Cir.1995), Def. Br. at 5, was *Cargill* under another name and so also concerned the Migratory Bird Rule.

Similarly, *United States v. Wilson*, 133 F.3d 251 (4th Cir.1997), discussed *supra* n. 3, invalidated subsection (a)(3) of the Corps' regulation on the grounds that federal jurisdiction could not extend to activities that *"could* affect interstate commerce." *Id.* at 257. That holding does not preclude Congress from enacting broad regulatory schemes pertaining to matters that *substantially* affect interstate commerce. The statute defining "navigable waters" does not refer to commerce, as did the statute at issue in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), so that case is no precedent for making the Government show a nexus to interstate commerce in this case. And much of the force of Judge Merritt's concurring opinion in *United States v. Larkins*, 852 F.2d 189, 193 (6th Cir.1988), is dissipated by the Supreme Court's holding in *Solid Waste Agency.* Judge Merritt was concerned that "the Corps has now expanded the definition of 'navigable waters' to include any creek or stream or moist area." As *Solid Waste Agency* shows, creeks, streams, and moist areas that are entirely intrastate, nonnavigable, and not connected with navigable waters are *not* subject to federal jurisdiction.

Finally, the two cases dating from 1913 precede both the Clean Water Act and the Court's continuing recognition and acceptance of the expansion of the Commerce Clause. That recognition and acceptance was repeated in *Lopez.*[18] *Lopez*, in effect, reiterated the holding of *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968),[19] that the Court had never " 'declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities.' " 514 U.S. at 558, 115 S.Ct. 1624 (quoting *Wirtz*, 392 U.S. at 197, n. 27, 88 S.Ct. 2017). *Wirtz* also held that " 'where a *general regulatory statute bears a substantial relation to commerce*, the *de minimis* character of individual instances arising under that statute is of no consequence.' " *Id.* This would hold true even where the regulatory scheme allows for substantial participation by the states, because the federal government's decision to share its legitimate powers with the states does not alter the constitutional basis for the exercise of federal power in the first place.

Buday concludes that "[i]f the jurisdiction of the federal government is extended to this small stream and wetlands in the back country of Montana, there would be practically no water in the United States

---

**18.** Chief Justice Rehnquist, writing for the majority, stated:

> *Jones & Laughlin Steel, Darby*, and *Wickard* ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause. In part, this was a recognition of the great changes that had occurred in the way business was carried on in this country.... But the doctrinal changes also reflected a view that earlier Commerce Clause cases artificially had constrained the authority of Congress to regulate interstate commerce.

> But even these modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits.

514 U.S. at 556–57, 115 S.Ct. 1624.

**19.** *Wirtz* was overruled on other grounds by *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which was itself overruled by *Garcia v. San Antonio Met. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). This checkered procedural past has nothing to do with the present case.

outside the reach of the [Clean Water Act]." His statement is almost correct. There is no limitation on federal jurisdiction over *open waters that flow into* interstate waters or waters that are navigable-in-fact.

### C. Does the rule of lenity prohibit Buday's prosecution?

The rule of lenity is an equitable rule. The Government averred in its offer of proof at the plea colloquy that "Mr. Buday knew that to do work like this in the wetland area, that you had to have a permit from the Army Corps of Engineers." Change of Plea Transcript, Jan. 9, 2001, at 23, lines 23–25. Buday was asked whether he thought there was anything wrong or anything that he disagreed with in the Government's offer of proof. He replied, "No, sir." *Id.* at 25, lines 18–22. Buday knew that he should obtain a permit from the Army Corps of Engineers. He simply did not. Under these circumstances, the rule of lenity will not be applied because it would be inequitable to do so.

### III. Conclusion

There is no "fair and just reason" to allow Buday to withdraw his guilty plea. Pursuant to 33 U.S.C. § 1362(7) and 33 C.F.R. § 328.3(a)(1), (2), (5), and (7), the federal government has jurisdiction to regulate the discharge of pollutants into tributaries of navigable waters. Buday's motion is denied.

Accordingly, IT IS HEREBY ORDERED that Defendant Buday's motion to withdraw his guilty plea (dkt # 19) is DENIED. This case will proceed to sentencing on April 13, 2001, at 8:30 a.m.