**CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, Plaintiff,**

v.

**DIABLO GRANDE, INC., Defendant.**

**No. CIV–F–00–5979 OWW SMS.**

United States District Court, E.D. California.

March 21, 2002.

---

CA000002, the General Permit for Storm Water Discharges Associated with Construction Activity (the "General Permit"). *See* Complaint. Defendant moves for summary judgment on the grounds that Plaintiff lacks standing; the only alleged violation of the Clean Water Act (the "Act") had been resolved at the time this action was filed; Plaintiff has never identified where, when or how Defendant allegedly discharged a pollutant into navigable waters; and Plaintiff has not identified how Defendant continues to violate the General Permit. *See* Docs.42, 43. Plaintiff countermoves for partial summary judgment on the issues of standing, Salado Creek as a navigable water of the United States, and subject matter jurisdiction. *See* Doc.61. Oral argument was heard on January 18, 2002.

Joseph J Tabacco, Jr, Berman DeValerio Pease Tabacco Burt and Pucillo, Richard R. Wiebe, Law Offices of Richard R. Wiebe, San Francisco, CA, for California Sportfish.

Ryan S Bezerra, Bartkiewicz Kronick and Shanahan, Sacramento, CA, for Diablo Grande Inc.

MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WANGER, District Judge.

## I. *INTRODUCTION*

California Sportfishing Protection Alliance ("Plaintiff" or "CSPA") sues Diablo Grande, Inc. ("Defendant" or "Diablo Grande"), under the Clean Water Act, 33 U.S.C. § 1365, for violations of California's National Pollutant Discharge Elimination System ("NPDES"), General Permit No.

## II. *BACKGROUND*

In 1991, Diablo Grande, L.P., a limited partnership, proposed to build a destination resort community (the "Diablo Grande project") on a 29,500 acre parcel of land in the Coast Range west of Patterson, California (the "Property"). *See* Doc.60, Plaintiff's Response to Defendant's Statement of Undisputed Facts, p.2:4–9. Defendant, Diablo Grande, Inc., is the managing general partner in Diablo Grande, L.P. *See id* at p.2:9–14.

Plaintiff is a California nonprofit public benefit corporation incorporated in 1983 with a self-proclaimed membership of 10,-000. *See* Doc.48 at Exh. O; Complaint. Bill Jennings is Plaintiff's chairman and has been since at least 1990. *See* Doc.60 at p.3:22–25. In response to interrogatories, Plaintiff identified Bill Jennings and Steve Burke as the only CSPA members whose interests allegedly were injured by discharges by Defendant. Steve Burke stopped being a member of CSPA on February 1, 2000. Bill Jennings stopped fish-

ing in the early 1990s. *See id.* at p.20. CSPA's bylaws do not require new directors to be Associate Members of CSPA. *See id.* at p.22:22. The parties dispute the degree to which CSPA directors participate in CSPA's decision making in Clean Water Act lawsuits and whether CSPA's directors have discussed this case at board meetings. *See id.* at p.23.

Salado Creek runs through the Property. *See id.* at p.2:16–20. Just east of Highway 33 in Patterson, any water flowing in Salado Creek is conveyed over a weir and into an underground pipeline which eventually connects to the San Joaquin River. *See id.* at p.4:21–25. The parties dispute the extent to which Salado Creek was dry. Defendant maintains Salado Creek between its headwaters and Patterson was almost always dry before Defendant built golf courses on the Property. *See id.* at p.3:1–4. Defendant asserts that although water from golf course irrigation seeps into the creek bed, Salado Creek is still usually dry in Patterson. *See id.* at p.3:9–13. Plaintiff asserts Salado Creek sustains perennial pools that existed prior to construction of the golf courses. *See id.* at p.3:1–8. Defendant contends Salado Creek contains no fish; Plaintiff contends Salado Creek does contain fish. *See id.* at p.4:13–20.

On March 3, 1994, Defendant filed with the State Water Resources Control Board a Notice of Intent to Comply with the General Permit to Discharge Storm Water Associated with Construction Activity. *See* Doc.49 at Exh. A. Defendant built improvements on approximately 391 acres of the Property. *See* Doc.60 at p.6:13–20. Approximately 360 of those acres are devoted to two golf courses, the Ranch and Legends Courses and accompanying clubhouse, located in the Oak Flat area of the Property. *See id.;* Doc.43 at p.3:8. Defendant also completed construction of a water transmission line that runs from the valley floor through Salado Creek canyon to Oak Flat and Diablo Grande Parkway, a 5.8–mile road running through Salado Creek canyon at varying distances from Salado Creek up to Oak Flat. *See* Doc.60 at p.7:1–11. Most of the construction of these improvements took place between October 1995 and July 1996. *See id.* at p.8. Other than the Legends Course, the existing improvements were completed by July 1996. The Legends Course was completed in May 1998. *See id.* at p.9. Defendant has not constructed any improvements since the completion of the Legends Course. *See id.*

Pursuant to Stanislaus County requirements, there is a 50–foot wide buffer of natural vegetation on each side of the centerline of Salado Creek situated within the Ranch and Legends Courses. Rainfall that falls on the golf courses drains either directly across the courses and their natural vegetation buffers or through pipes buried in the buffers to drain swales in the courses. Storm water from the facilities within golf courses drains through the courses. *See id.* at p.10.

Diablo Grande Parkway crosses Salado Creek at four places. The two eastern crossings are facilitated by two large culverts, each about one mile apart. The Parkway is generally located on the northern slope of Salado Creek, but is located to the south of the Creek between the two eastern crossings. The parties dispute the extent to which the slopes between the Parkway and Salado Creek are naturally vegetated. Diablo Grande Parkway contains many storm water inlets, including approximately 42 down drains and various short pipes in its curbs, that allow storm water to flow off of the Parkway, most of which were designed to disperse storm water onto the slopes of natural vegetation between the Parkway and the bed of Salado Creek. *See id.* at p.11. Several of the

Parkway's storm water inlets drain into pipes that convey storm water directly to the bed of Salado Creek. *See id.* at p.12.

Diablo did not have a formal erosion control monitoring program during the period after the completion of the current improvements (the May 1998 completion of the Legends Course) and October 1999. On October 14, 1999, Leonilo Sarmiento, a staff member of the California Regional Water Quality Control Board ("CRWQCB" or the "Regional Board") inspected the Diablo Grande project's completed facilities. *See id.* at p.13. Sarmiento sent Defendant a letter dated October 22, 1999, attaching an inspection report. *See* Doc.49 at Exh. E. Sarmiento issued Defendant a Notice to Comply dated October 14, 1999. *See id.* at Exh. F.

In October 1999, Diablo Grande's Development Coordinator, Keith Schneider, updated Diablo Grande's Storm Water Pollution Prevention Plan ("SWPPP"). *See* Doc.60 at p.14:9–11; Doc.49 at Exh. G. By June 1, 2000, Defendant's contractors installed approximately 19,360 lineal feet of crushed gravel and rock on the shoulders of Diablo Grande Parkway. *See* Doc.60 at p.14:16–20. Between October 14, 1999, and May 1, 2000, Diablo Grande and its contractors installed hay bales and/or crushed rock bags at 90–degree angles to the flow of water on Diablo Grande Parkway in order to capture sediment in that water. *See id.* at p.14:21–26. During this period, Defendant and its contractors installed rocks below several of the Parkway's storm water inlets in order to prevent erosion of the slopes between the Parkway and the bed of Salado Creek. By the end of March 2000, Defendant's contractor had re-hydroseeded two cut slopes associated with the Parkway and pinned netting to those slopes to promote the growth of the grass. The parties dispute whether Defendant has maintained the slopes of natural vegetation between the Parkway and

the bed of Salado Creek to filter storm water flowing off the Parkway. Beginning in January 2000, Defendant implemented an erosion control monitoring program focused on rainfall events. *See* Doc.60 at p.15. This program involves sampling Salado Creek water for turbidity between Monitoring Stations 1 through 6. *See id.* at p.16:1–6; Doc.38 at Fig.1 (indicating the location of Monitoring Stations 1 through 6).

On February 15, 2000, Sarmiento conducted an inspection of the completed facilities at the Property. Sarmiento witnessed employees of Diablo Grande using a water truck to wash sediment off Diablo Grande Parkway. Sarmiento informed Keith Schneider of his observations and that the washing was a discharge of sediment into storm drains in violation of the General Permit. *See* Doc.60 at p. 16:13–25. On February 15, 2000, Schneider told Sarmiento that Diablo Grande's employees and contractors would no longer wash accumulated sediment off the paved surface of the Parkway and would instead use manual means to remove sediment. On February 15, 2000, Schneider sent a memorandum to Diablo Grande's General Manager, Stan Duck, informing Duck that the water truck should no longer be used to wash accumulated sediment off the Parkway and that sediment removal should be done with brooms and shovels. *See* Doc.49 at Exh. K; Doc. 47 at ¶1; Doc.60 at p.17:9–14. Duck informed Diablo Grande's maintenance staff and representatives of Teichert Construction, a Diablo Grande contractor, that the water truck was not to used to wash sediment off the Parkway. *See* Doc.60 at p.17:15–20; Doc.49 at Exh. K. Schneider sent a facsimile to Sarmiento containing memoranda between Duck and Schneider regarding the informing of staff and contractors not to use the water truck to wash sediment off the Parkway. There is no evidence Defendant or its contractors

have used water to wash sediment into the Parkway's storm water inlets since February 15, 2000. *See* Doc.60 at p.18:17–21.

On April 4, 2000, CRWQCB issued a Notice of Violation to Defendant. *See* Doc.60 at p.19:1–12; Doc.49 at Exh. J. Through its counsel, Plaintiff sent Defendant an intent to sue letter on April 19, 2000. *See* Doc.60 at p.19:14–19; Doc.49 at Exh. L. Plaintiff filed this action on July 5, 2000. *See* Doc.1, Complaint. Plaintiff seeks an injunction ordering Defendant 1) to operate its construction site in compliance with the General Permit; 2) to provide Plaintiff with documentation of its compliance with the Act for a one-year period; 3) to contribute payments to a court-approved environmental remediation fund; 4) to pay civil penalties of $27,500 per day for each violation; 5) to pay Plaintiff's reasonable attorneys' fees and costs as authorized by the Act; and 6) all other relief as may be just. *See* Complaint.

### III. *LEGAL STANDARD*

#### A. *Summary Judgment*

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *see California v. Campbell*, 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in light most favorable to the nonmoving party. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins.*

*Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1107 (9th Cir.2000). Instead, the nonmoving party, through affidavits or other admissible evidence, "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P 56(e).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

Evidence submitted in support of, or in opposition to, a motion for summary judgment must be admissible under the standard articulated in 56(e). Properly authenticated documents can be used in a

motion for summary judgment if appropriately authenticated by affidavit or declaration. *See Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550–51 (9th Cir.1989). Supporting and opposing affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show that the affiant is competent to testify to the matters stated therein. *See* Fed.R. Civ.P. 56(e).

### B. *Summary Adjudication*

Summary adjudication may be appropriate on clearly defined, distinct issues. *See Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir.1990). Fed.R. Civ.P. 56 allows a party to move for summary judgment on any part of a claim. *See* Fed.R. Civ.P. 56(a)-(d). The purpose of summary adjudication is to salvage some results from the judicial effort involved in evaluating a summary judgment motion and to frame narrow triable issues if the court finds that the order would be helpful with the progress of litigation. *See* Fed.R. Civ.P. 56(d); *National Union Fire Ins. Co. v. L.E. Myers Co., Inc.*, 937 F.Supp. 276, 284 (S.D.N.Y.1996). An order under Rule 56(d) narrows the issues and enables the parties to recognize more fully their rights, yet it permits the court to retain full power to completely adjudicate all aspects of the case when the proper time arrives. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (3d ed.1998), § 2737 at 316–18. Summary adjudication may be used to dispose of affirmative defenses. *See "Z" v. Worley*, 2001 U.S. Dist. LEXIS 9476 (disposing of affirmative defense to battery claim on summary adjudication); *Sterling Bank v. Sterling Bank & Trust*, 928 F.Supp. 1014 (1996).

The procedure under Rule 56(d) is designed to be ancillary to a summary judgment motion. Unlike Rule 56(c), which allows for interlocutory judgment on a question of liability, Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 2737 at 316–18. This aspect of the rule has been confused due to courts' frequently referring to Rule 56(d) orders as "partial summary judgment" rather than summary adjudication. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 2737 at 322–24.

The obligation imposed on the court by Rule 56(d) to specify the uncontroverted material facts is technically compulsory. *See Woods v. Mertes*, 9 F.R.D. 318, 320 (D.Del.1949). However, if the court determines that identifying indisputable facts through partial summary adjudication would not materially expedite the adjudicative process, it may decline to do so. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 2737 at 318–19.

### IV. *ANALYSIS*

#### A. *Standing of California Sportfishing Protection Alliance*

Defendant asserts Plaintiff lacks standing to bring this lawsuit. *See* Doc.43 at p.10:12–27. Defendant argues Plaintiff's individual members have no ability to influence Plaintiff's decisions in Clean Water Act lawsuits. *See id.* Defendant also argues Plaintiff's purpose is limited to promoting sportfishing, and since there are no fish in Salado Creek, this lawsuit is not germane to Plaintiff's purpose. *See id.* Plaintiff asserts it does have standing and that Defendant's arguments represent a misreading of the applicable standard. *See* Doc.61 at p.1:11–19.

An association has standing to assert its members' claims only where 1) its members would otherwise have standing to sue in their own right; 2) the interests it

seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Plaintiff is a California nonprofit public benefit corporation incorporated in 1983 with a self-proclaimed membership of 10,-000. *See* Doc.48 at Exh. O; Complaint. Defendant argues an association has standing to bring suit on behalf of its members only if its members possess certain indicia of membership in the organization. *See* Doc.43 at p.11:3–5. However, the "indicia of membership" requirement in *Hunt* applies only to situations in which an organization is attempting to bring suit on behalf of individuals who are not members. *See Hunt,* 432 U.S. at 344, 97 S.Ct. 2434 (holding that the "apple growers and dealers [who] are not 'members' of the Commission in the traditional trade association sense [nevertheless] possess all of the indicia of membership in an organization"); *Individuals for Responsible Gov't v. Washoe County,* 110 F.3d 699, 702 (9th Cir.1997) (holding that an organization lacking both members and purpose had no standing); *Doe v. Stincer,* 175 F.3d 879, 885 (11th Cir.1999) (holding that plaintiff Advocacy Center, "not a membership organization," had standing to represent claims on behalf of its mentally disabled constituents); *Friends of the Earth, Inc. v. Chevron Chem. Co.,* 129 F.3d 826, 827–29 (5th Cir.1997) (analyzing whether Friends of the Earth met *Hunt's* "indicia of membership" test only because the district court found the organization had no members);

*Fed. Election Comm'n v. GOPAC, Inc.,* 897 F.Supp. 615, 618 (D.D.C.1995) (applying the "indicia of membership" test because plaintiff "GOPAC 'is not a traditional voluntary membership organization such as a trade association, for it has no members at all' "). Defendant cites *Public Interest Research Group v. Magnesium Elektron, Inc.,* 123 F.3d 111, 119 (3rd Cir. 1997), for the proposition that organizations must prove that their members possess the "indicia of membership" in order to have standing to bring suit. However, the court in *Magnesium* took membership as a given and went on to discuss the first factor identified in *Hunt,* whether the individual members would have standing to sue on their own.[1] *See Magnesium,* 123 F.3d at 119. Plaintiff brings suit here on behalf of its associate members such as CSPA Chairman Bill Jennings; no nonmember individuals' claims are alleged in the Complaint. *See* Complaint; Doc.48, Exh.S, p.2 ("Any person who pays the annual individual membership dues to this corporation, as prescribed by the Board of Directors, shall be an Associate Member."). Defendant presents no evidence Plaintiff is not a traditional voluntary membership organization. The "indicia of membership" test is not applicable. Defendant presents no evidence that at least one of CSPA's members would not have standing to sue in his own right.

Defendant argues Plaintiff lacks standing because this action is not germane to Plaintiff's purpose as an organization. *See* Doc.43 at p.12:13. The germaneness test is easily met. *See Presidio Golf Club v. Nat'l Park Serv.,* 155 F.3d 1153, 1159 (9th Cir.1998) ("courts have generally found the

---

1. The relevant section begins:

   To meet the requirements of organizational standing, PIRG and FOE need only prove that their members possess the "indicia of membership" in their organizations. Thus, in considering PIRG's standing, we will consider only if PIRG's members would have standing as individuals to sue MEI.

   *Magnesium,* 123 F.3d at 119 (citing *Hunt* at 344, 97 S.Ct. 2434).

germaneness test to be undemanding"). In *Presidio*, the Presidio Golf Club's suit under the National Environmental Policy Act and the National Historic Preservation Act was held to be germane to the Club's purpose even though the stated purposes of the corporation did not include any environmental or historical objectives. *See id.* The "Club's interest in maintaining the historical and environmental integrity of the Clubhouse" fell within the Acts' zone of interests and was sufficient to meet the germaneness test since the "members are the actual beneficiaries of the rustic and historical ambience of the Clubhouse." *Id.*

Plaintiff brings this action under the Clean Water Act. "The objective of [the Act] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act aims to preserve a standard of "water quality which provides for the protection and propagation of fish." 33 U.S.C. § 1251(a)(2). CSPA's purposes include the promotion, protection, restoration, and enhancement of the quality of sportfishing in California. *See* Doc.48 at Exhs. P and T. "Our highest priority is to protect and restore the aquatic environment required to sustain healthy fisheries in our state's streams, rivers and estuaries . . . ." Doc.48 at Exh. T. CSPA's aim "to protect and restore the aquatic environment required to sustain healthy fisheries," *see id.*, is virtually identical with the Act's objective to preserve a standard of "water quality which provides for the protection and propagation of fish." 33 U.S.C. § 1251(a)(2).

Plaintiff alleges Defendant's ongoing violations of the Act "will cause irreparable injury to the fish, wildlife, and other aquatic resources of Salado Creek, the interests of plaintiff, its members, and the public." Complaint at ¶ 17. The germaneness prong requires "only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Humane Soc'y v. Hodel,* 840 F.2d 45, 56 (D.C.Cir.1988). Plaintiff's litigation goals in this action are germane to Plaintiff's purpose as an organization dedicated to preservation of fish resources and stream quality sufficient to meet the second prong of *Hunt's* test for organizational standing.

Defendant argues this action regarding Salado Creek cannot be germane to CSPA's purpose in protecting fish since Plaintiff has produced no evidence that fish live in Salado Creek. *See* Doc.43 at p.14. Plaintiff alleges fish live in Salado Creek. *See* Complaint at ¶ 17. Plaintiff produces evidence that fish live in Salado Creek. *See* Doc.62, Exh. L, Technical Appendix to the Specific Plan for the Diablo Grande Project, dated September 1992, at p.42 ("We did not conduct surveys for fish in the creeks, but we observed bluegill."); Doc.62, Exh. K, Diablo Grande Specific Plan Draft Environmental Impact Report, dated August 31, 1992, at IV–109 ("Several bluegill were observed in the portion of Salado Creek in Oak Flat Valley during the site visit."); Doc.62, Exh. J, Summary of Field Survey Observations at Salado Creek by Robert Leidy of the EPA (finding mosquitofish and bullhead in Salado Creek). In his declaration, Bill Jennings states that "bluegill and bullhead are sport fish." Jennings Decl. at ¶ 10; *see also* Lakewide Management Plan for Lake Ontario, App. E, http://www.epa.gov/glnpo/lakeont/app-e.pdf (listing bluegill and brown bullhead among species of sportfish). Further, Salado Creek feeds into other waters including the San Joaquin River. Any migration of pollution from Salado Creek could threaten fish in those waters. Even if Plaintiff's standing depended on their offering evidence of the existence of fish in Salado Creek, Plaintiff's showing is sufficient.

Plaintiff is a voluntary membership organization whose members would otherwise have standing to sue in their own right. The interests Plaintiff seeks to protect (preservation of aquatic habitat) are germane to the organization's fishery resource purpose. Plaintiff's Clean Water Act claim for declaratory and injunctive relief does not require the participation of individual members in the lawsuit as a suit for damages might. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The undisputed facts show that Plaintiff has standing to pursue this action. Plaintiff's motion for partial summary judgment on the issue of standing is GRANTED; Defendant's motion for summary judgment on the ground Plaintiff lacks standing is DENIED.

### B. *Jurisdiction I: Adequate Notice*

Defendant argues Plaintiff has failed to file a notice of intent to sue sufficient to create jurisdiction in this case. *See* Doc.43 at p.16. Defendant contends Plaintiff adequately identified only one alleged violation of the Act and that the one identified violation was not ongoing at the time the Complaint was filed. *See id.* Plaintiff argues it adequately identified multiple violations which were ongoing when the Complaint was filed. *See* Doc.61 at pp.15–20.

The Clean Water Act provides that "any citizen may commence a civil action ... against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). The Act specifies that no such action shall commence "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs,

and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). The corresponding Environmental Protection Agency ("EPA") regulation provides:

Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). A federal court lacks subject matter jurisdiction where a plaintiff fails to comply with the Act's notice requirement. *See Natural Resources Defense Council v. Southwest Marine, Inc.,* 236 F.3d 985, 995 (9th Cir.2000).

Plaintiff sent a notice letter on April 19, 2000, more than 60 days before filing this Complaint on July 5, 2000. *See* Doc.49 at Exh. L (the "Notice Letter"); Doc.1. The Notice Letter identifies Defendant, "Diablo Grande, Inc.," and identifies the 29,500 acre Property as "the site" of Clean Water Act violations. *See* Notice Letter. The Notice Letter continues:

.... The site is discharging materials other than stormwater (settleable solids, water with elevated turbidity) to Salado Creek, a tributary of the San Joaquin River. See, Notice of Violation from the Regional Board dated April 4, 2000, a copy of which is specifically incorporated herein by this reference.

The specific standards violated are Discharge Prohibitions Nos. 1 and 2, Receiving Water Limitation No. 2, Section C(2) and Section A(2)(a). We are particularly concerned that in your con-

struction work you are not using best management practices ("BMPs") to reduce or eliminate non-stormwater discharges from the site. The date of the violations of your effluent limitation,[2] monitoring and reporting requirements is February 15, 2000.

We hereby give you notice pursuant to Section 1365 of the Clean Water Act that we intend to file proceedings in Federal Court requiring you to eliminate non-stormwater discharges without a site-specific NPDES permit, to implement BMP's and for an assessment of penalties for discharging pollutants contrary to your construction NPDES permit, on the date identified and for each date hereafter where there is a rainfall event over 0.1 inch.

Notice Letter at pp.1–2.

The Notice of Violation from the Regional Board, dated April 4, 2000, incorporated by reference into the Notice Letter, refers to the Notice of Violation of the California General NPDES Permit for Storm Water Discharges Associated with Construction Activities, attached as Exhibit J to Document 49 (the "Notice of Violation"). The Notice of Violation describes an inspection of the Property made by the Central Valley Regional Water Quality Control Board in which evidence of sediment discharge into storm drains leading to Salado Creek was observed. *See* Notice of Violation. Attached to the Notice of Violation is an Inspection Report advising Defendant that it "needs to update its SWPPP and monitoring plan to address street washing operations ... to prevent future discharge of sediments from street washing and further erosion on cut slopes and road shoulders along Oak Flat Road." *Id.* The Inspection

Report concluded: "The discharge of sediments to the waters of the State from street washing warrants the issuance of a Notice of Violation." *Id.*

Defendant contends the Notice Letter gave Defendant no information about 1) what acts or omissions might cause violations when it rains; 2) what provisions might be violated by such acts or omissions; and 3) the locations of such violations. *See* Doc.43 at p.18:3–6. Defendant contends adequate notice was given only with respect to any discharge that might result from washing sediment off roads with a water truck. *See id.* at p.18:25–27. To be adequate, the Notice Letter must include "the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a). The Notice Letter identifies Defendant as the responsible party and provides Plaintiff's full name, address, and telephone number. *See* Notice Letter. It identifies the location of the violations as being the Property. *See id.* It identifies February 15, 2000, as the date of the violation and every subsequent date "where there is a rainfall event over 0.1 inch." *Id.*

Plaintiff's description of location and date is sufficient to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated 40 C.F.R. § 135.3(a); *see also Southwest Marine*, 236 F.3d at 996 ("Although the [notice] letter did not identify a specific date, or a specific location within South-

---

**2.** The Act defines the term "effluent limitation" to mean:

any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are dis-

charged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

33 U.S.C. § 1362(11).

west Marine's facility, it nevertheless satisfied those requirements as well."). "[T]he failure to develop and implement pollution prevention plans are violations 'occurring at the facility in general.'" *Id.* (citation omitted). Since "'the deficiencies in these plans are ongoing, . . . there is no specific date that can be alleged as the date of the violation.'" *Id.* (citation omitted). As in *Southwest Marine*, the Notice Letter alleged a facility-wide location and ongoing violations sufficient to satisfy the Act's notice requirement. *See Southwest Marine*, 236 F.3d at 996.

The "activity alleged to constitute a violation," 40 C.F.R. § 135.3(a), includes street washing of sediment, failing to prevent further erosion on cut slopes and road shoulders along Oak Flat Road, *see* Notice of Violation, discharging in violation of Discharge Prohibitions 1 and 2 of the permit, failing to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") as required by Receiving Water Limitation No. 2 and Sections (C)(2) and (A)(2)(a) of the permit, failing to monitor and report discharges as required by the permit, and failing to develop and implement BMPs, *see* Notice Letter. Because Plaintiff is "alleging that Defendant ha[s] failed to prepare and implement plans that [a]re required by its permit," specifying the sections of the permit violated, the Notice Letter gives sufficient notice of the acts and omissions constituting the alleged violations. *Southwest Marine*, 236 F.3d at 996 ("The letter charged, among other things, that Defendant had failed to prepare an SWPPP that complied with the specific requirements of Defendant's storm water permit; identified the source of the requirement that Defendant prepare an adequate SWPPP; and explained the ways in which Defendant's then-existing SWPPP did not comply with the storm water permit.").

The Notice Letter's statement that the "site is discharging materials other than stormwater (settleable solids, water with elevated turbidity) to Salado Creek" together with specific references to permit sections, the Notice of Violation, and the language of the Act is sufficient to satisfy the Act's notice requirement. Defendant's motion for summary judgment on the ground Plaintiff's notice of intent to sue was insufficient is DENIED.

"Subject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant." *Southwest Marine*, 236 F.3d at 997. Plaintiff sent Defendant adequate notice of its intent to sue 60 days prior to filing this Complaint. Jurisdiction also requires that Plaintiff allege ongoing violations of the Act.

C. *Jurisdiction II: Ongoing Violations of the Act*

The Clean Water Act does not authorize citizen suits to redress violations of the Act that are wholly past. *See Southwest Marine*, 236 F.3d at 998 (citing *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)). Plaintiffs pursuing citizen suits under the Act must allege in good faith continuous or intermittent violations. *See id.* A "citizen plaintiff may prove ongoing violations either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Id.* (citations and internal alterations omitted). "[I]ntermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Id.*

Defendant argues any violations of the Act were wholly past when Plaintiff

brought this suit. *See* Doc.43 at p.19:3. The Notice of Violation reports that upon being made aware of the observed discharge of sediments and the requirements of the permit, Defendant stated it "would cease hosing down of sediments and implement control measures to prevent future discharge of sediments from the truck washing operation." Doc.49, Exh. J, Notice of Violation, Inspection Report. Defendant "also said that gully erosion on cut slopes along the Oak Flat Road will be repaired and stabilized." *Id.* Defendant sent a memorandum to Stan Duck, its General Manager, advising him that "the Diablo Grande water truck and other construction company water trucks shall not be used for hosing down the Diablo Grande Parkway or its appurtenant drainage structures *under any circumstances.*" Doc.49, Exh. K, Schneider's Mem. to Duck. The memorandum instructs that dirt removal be done with brooms and shovels. *See id.* The memorandum asks Duck to "advise the maintenance staff and construction company personnel of this policy immediately" and attaches an announcement of the policy to be placed on the employee bulletin board. *See id.* The memorandum is dated February 15, 2000, the same day Regional Board staff member Sarmiento discussed the truck washing with Keith Schneider, Diablo Grande's Development Coordinator. *See id.* A return memorandum from Duck to Schneider suggests Duck told Diablo Grande employees and Teichert Construction that water would not be used for cleaning under any circumstances and that dirt and sediment would be removed with shovels and brooms. *See id.*

Defendant contends neither it nor any of its contractors has used water to wash sediment off Diablo Grande Parkway since February 15, 2000. *See* Doc.43 at p.19:24–25. Defendant contends it has used only manual means to remove sediment since February 15. *See id.* at p.19:25–27. Defendant argues the washing of sediment off Diablo Grande Parkway was the only violation for which adequate notice of an intent to sue was given; since that violation was wholly past by the time Plaintiff filed suit in July 2000, and Plaintiff's suit cannot be maintained. *See id.* at p.20:3–7.

Defendant cites the decision in *San Francisco Baykeeper v. Moore,* 180 F.Supp.2d 1116 at 1122–24, 2001 U.S. Dist. Lexis 2980 at \*13–\*19 (E.D.Cal.2001), for the proposition that behavioral solutions may be sufficient to address violations. *See* Doc.79 at p.6 n. 3. In *Moore,* defendant California Department of Boating and Waterways voluntarily suspended its program of herbicide spraying in the San Francisco Bay Delta pending the Regional Board's decision regarding its application for a NPDES permit. *See id.* While the permit was pending, plaintiff filed suit, alleging the herbicide spraying was a violation of the Clean Water Act. *See id.* In granting summary judgment in favor of defendant, the court held plaintiff could not satisfy its burden of showing a likelihood of a recurring violation. *See id.* Defendant appears to have taken all steps recommended by the Regional Board.

*Moore* is distinguishable from the instant case. In *Moore,* the only violation in suit was the herbicide spraying, an activity defendant voluntarily ceased until the Regional Board review was complete. Here, Plaintiff alleges several violations in addition to street washing, the activity Defendant claims to have voluntarily ceased. In *Moore,* defendant stated it would not resume the allegedly unlawful activity until the Regional Board completed the processing of its NPDES application. Here, Defendant has not addressed other activities that occur when the proposed continuation of Phase I construction recommences.

In order to survive summary judgment, Plaintiff must offer evidence to support

good-faith allegations of noncompliance at the time the suit was filed. *See Sierra Club v. Union Oil Co.*, 853 F.2d 667, 669 (9th Cir.1988); *Bosma*, 143 F.Supp.2d at 1181. Plaintiff must demonstrate there is a genuine issue of fact as to whether Defendant was violating the Act when the Complaint was filed. *See id.*

Plaintiff presents the Declaration of G. Fred Lee, a qualified expert, *see* Doc.63 at Exh. B, which states Defendant's own turbidity reports from Salado Creek indicate turbidity level increases in excess of permissible levels. *See* Lee Decl., Doc.63, at ¶ 11. CRWQCB's Basin Plan for the Sacramento River and San Joaquin River Basins (the "Basin Plan") provides that "[i]ncreases in turbidity attributable to controllable water quality factors shall not exceed [ten percent] [w]here natural turbidity is greater than 100 NTUs [3]." Basin Plan, Doc.69, Exh. B at III–9.00. Although

Lee does not detail his method of applying "appropriate averaging periods," *see id.*, in determining compliance, his expert opinion based on a review of Defendant's turbidity records is that Defendant exceeded allowable turbidity levels in 2001 causing Defendant to violate Discharge Prohibitions Nos. 1 [4] and 2,[5] Receiving Water Limitation No. 2,[6] and Special Provision for Construction Activity No. 2.[7] *See* Lee's Decl. at ¶ 11. Lee declares the "turbidity violations in Salado Creek will continue to occur whenever the rainfall exceeds 0.5 inches in a 24–hour period and possibly at lesser rainfall levels as well." *Id.* Plaintiff produces evidence Defendant failed to report elevated turbidity levels to the CRWQCB and failed to develop an implementation schedule for corrective actions, when it was within Defendant's ability to do so. *See* Doc.62, Exh. Q, Sarmiento's Depo., p.40:15–p.41:8.

3. An NTU, or Nephelometric Turbidity Unit, is a unit of measurement for turbidity levels.

4. Discharge Prohibition No. 1 provides: "Authorization pursuant to this General Permit does not constitute an exemption to applicable discharge prohibitions prescribed in Basin Plans, as implemented by the nine RWQCBs." General Permit at p.3.

5. Discharge Prohibition No. 2 provides: "Discharges of material other than storm water which are not otherwise authorized by a NPDES permit to a separate storm sewer system (MS4) or waters of the nation are prohibited, except as allowed in Special Provisions for Construction Activity, C.3." General Permit at p.3. Provision C.3. provides

Discharges of non-storm water are authorized only where they do not cause or contribute to a violation of any water quality standard and are controlled through implementation of appropriate BMPs for elimination or reduction of pollutants. Implementation of appropriate BMPs is a condition for authorization of non-storm water discharges. Non-storm water discharges and the BMPs appropriate for their control must be described in the SWPPP. Wherever feasible, alternatives which do not result

in discharge of nonstorm water shall be implemented in accordance with Section A.9 of the SWPPP requirements.
General Permit at p.5.

6. Receiving Water Limitation No. 2 provides:

The SWPPP developed for the construction activity covered by this General Permit shall be designed and implemented such that storm water discharges and authorized nonstorm water discharges shall not cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control plan and/or the applicable RWQCB's Basin Plan.
General Permit at p.4.

7. Special Provision for Construction Activity No. 2 provides:

All dischargers shall develop and implement a SWPPP in accordance with Section A: Storm Water Pollution Prevention Plan. The discharger shall implement controls to reduce pollutants in storm water discharges from their construction sites to the BAT/BCT performance standard.
General Permit at p.5. "BAT/BCT" refers to "best available technology" and "best conventional technology." *See* Doc.79 at p.9:27–28.

These failures suggest continuing violations of the General Permit's Receiving Water Limitation No.3. *See* General Permit at p.4. Plaintiff produces evidence that the EPA found Defendant committed at least one BMP implementation violation after the Complaint was filed. *See* Doc.62, EPA Inspection Report, dated May 24, 2001 (indicating a slope needs to be properly stabilized).

Lee declares the "construction and development performed by Diablo Grande has in the past and is continuing to cause discharges of storm water containing sediment to Salado Creek." Lee's Decl. at ¶ 8. Defendant's expert, Michael D. Harvey, concludes that "there are a limited number of sediment producing sites that are related to development activities." *See* Doc.38, Supplement to Expert Report of Dr. Michael D. Harvey Regarding Sedimentation in Salado Creek, September 12, 2001, p.15; *see also* Doc.62, Exh. D, Expert Report of Dr. Michael D. Harvey, June 18, 2001, p.15 ("Activities associated with the Diablo Grande Inc. development of portions of the Salado Creek Watershed have produced some increases in the amount of sediment delivered to the creek."). Dr. Harvey does not quantify these increases or that they were not permit violations. Lee supports his conclusion with his observations of specific instances in which Defendant's BMPs were inadequately implemented. *See* Lee's Decl. at ¶ 10(ii).

Large amounts of sediment have washed into Salado Creek since Defendant began construction in 1995. *See* Doc.67, Hecht's Decl.; Doc.64, Moore's Decl., especially ¶ 78(c); Doc.66, Foster's Decl., especially ¶¶ 125, 138–39. The evidence suggests the large amounts of sediment are due, at least in part, to Defendant's construction activities. *See id.* In a letter to CRWQCB objecting to a proposal by Diablo Grande to construct the remaining components of Phase I, the EPA observes that "landowners immediately downstream of Diablo Grande have already documented significant adverse effects to the water quality and wetland habitat of Salado Creek due to: 1) the construction of the Diablo Grande Parkway; 2) installation of a water line and pump stations; and 3) construction of the golf course and club house facilities." Doc.40, Exh. 99 at Exh. E, Letter from the EPA to CRWQCB dated December 22, 1999, p.3.

Lee predicts the ongoing construction of the remaining components of Phase I of Diablo Grande's development project, a permit for which has been issued, *see* Doc.62 at Exh. P, will likely result in a recurrence of violations. *See* Lee's Decl. at ¶ 12. As part of its continued Phase I development of the Property, Defendant plans to construct 2,038 residential units, a town center, shopping center, public services, resort complex, and roads on a total of 1,069 acres of land. *See* Doc.62, Exh. P, Permit Number 199200769, dated June 20, 2001, at p.1. Already existing golf courses, parks, and vineyards cover 367.61 acres. *See id.* Lee declares the increase in impervious surfaces will increase the total runoff into Salado Creek. *See* Lee's Decl. at ¶ 12. The large soil disturbances which must accompany such a project and the cumulative impacts of the ongoing development render further violations of the Act likely. *See id.*; Doc.40, Exh. 99 at Exh. E at p.3.

■ Plaintiff's Notice Letter adequately informed Defendant of numerous violations of the Act upon which it intended to sue. *See* Notice Letter. Plaintiff produces evidence such that a reasonable trier of fact could find that Defendant violated the Act in the manner described its Notice Letter on or after the date this Complaint was filed in June 2000. Plaintiff establishes a reasonable likelihood that violations will recur. *See Southwest Marine*, 236 F.3d at

998. Defendant's motion for summary judgment on the ground Plaintiff produces no evidence of Defendant's ongoing violations of the Act is DENIED. Plaintiff's motion for partial summary judgment on the issue of jurisdiction is GRANTED. No finding is now possible as to future violations or even as to the nature and extent of alleged past reactive and complaint filing period violations.

### D.  Salado Creek as a Navigable Water of the United States

Defendant argues Salado Creek is not a "navigable water of the United States" within the meaning of the Act. See Doc.43 at p.24:18. Plaintiff moves for partial summary judgment to establish that Salado Creek is a "navigable water" within the meaning of the Act. See Doc.61 at p.22:17–20.

The Act regulates the discharge of pollutants into "navigable waters of the United States." 33 U.S.C. § 1344. The term "navigable waters" is defined under the Act as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The EPA has issued regulations defining the term "waters of the United States" as part of its administration of the NPDES Permit Program. See 40 C.F.R. § 122.2 (2002). The EPA's regulations define "waters of the United States" to include "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce...." Id. "Waters of the United States" also includes "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce...." Id. The EPA's regulations define tributaries of such waters as "waters of the United States." See id. The United States Army Corps of Engineers (the "Corps") defines "waters of the United States" in the same way. See 33 CFR § 328.3(a)(3); 33 CFR § 328.3(a)(5) (2002).

In Solid Waste Agency v. United States Army Corps of Eng'rs, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), the Court held that water in certain seasonal ponds in "an abandoned sand and gravel pit ... which provides habitat for migratory birds" was not a "navigable water" under the Act. Solid Waste, 531 U.S. at 162, 121 S.Ct. 675. The Corps refused to issue a federal landfill permit to a consortium of 23 suburban Chicago cities seeking to dispose of nonhazardous solid waste. See id. at 162–65, 121 S.Ct. 675. The Corps determined that "the seasonally ponded, abandoned gravel mining depressions" were "waters of the United States" because they "'are or would be used as habitat by other migratory birds which cross state lines.'" See Solid Waste, 531 U.S. at 164–65, 121 S.Ct. 675 (quoting Corps regulations known as the "Migratory Bird Rule"). The Court "conclude[d] that the 'Migratory Bird Rule' is not fairly supported by the CWA." Solid Waste, 531 U.S. at 167, 121 S.Ct. 675. While acknowledging that "the phrase 'navigable waters' [includes] at least some waters that would not be deemed 'navigable' under the classical understanding of that term," the isolated, intrastate, mostly seasonal ponds did not qualify as "navigable waters" simply because they served as habitat for migratory birds. See id. at 171–72, 121 S.Ct. 675. Without a clear statement from Congress supporting the Migratory Bird Rule, the Court declined to defer to the Corps' interpretation which raised "significant constitutional and federalism questions" regarding the scope of Congress's power under the Commerce Clause. Id. at 174, 121 S.Ct. 675.

In his disagreement with the majority opinion, Justice Stevens lamented the

Court's decision not to extend the Corps' administration of the Clean Water Act to so-called "isolated waters." *Solid Waste*, 531 U.S. at 176–77, 121 S.Ct. 675 (Stevens, J., dissenting) ("In its decision today, the Court draws a new jurisdictional line, one that invalidates the 1986 migratory bird regulation as well as the Corps' assertion of jurisdiction over all waters *except for actually navigable waters, their tributaries*, and wetlands adjacent to each.") (emphasis added). *Solid Waste* did not concern the well-established rule including tributaries in the definition of "navigable waters." The Ninth Circuit recognized as much in *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533–34, (9th Cir. 2001), holding that man-made irrigation canals are tributaries and therefore "waters of the United States" under the Act. *See Headwaters*, 243 F.3d at 533 ("Our conclusion is not affected by the Supreme Court's recent limitation on the meaning of 'navigable waters' in *Solid Waste* . . . ."). "Because the canals receive water from natural streams and lakes, and divert water to streams and creeks, they are connected as tributaries to other 'waters of the United States.'" *Headwaters*, 243 F.3d at 533. "Even tributaries that flow intermittently are 'waters of the United States.'" *Headwaters*, 243 F.3d at 534.

The court supported its holding by noting:

> "Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage . . . . It makes no difference that a stream was or was not at the time of the spill discharging water continuously into a river navigable in the traditional sense. Rather, as long as the tributary would flow into the navigable body [under certain conditions], it is capable of spreading environmental damage and is thus a 'water of the United States' under the Act."

*Headwaters*, 243 F.3d at 534 (quoting *United States v. Eidson*, 108 F.3d 1336, 1342 (11th Cir.1997)).

*Solid Waste* does not alter the rule that tributaries are "navigable waters" under the Act. *See Idaho Rural Council v. Bosma*, 143 F.Supp.2d 1169, 1178 (D.Idaho 2001) ("Though the Supreme Court has recently articulated its unwillingness to read the term 'navigable' entirely out of the CWA, it also made clear that waters of the United States include at least some waters that are not navigable in the classical sense, such as non-navigable tributaries and streams.") (citing *Solid Waste*); *United States v. Buday*, 138 F.Supp.2d 1282, 1295 (D.Mont.2001) ("the federal government has jurisdiction to regulate the discharge of pollutants into tributaries of navigable waters"); *United States v. Interstate Gen. Co.*, 152 F.Supp.2d 843, 847 (D.Md.2001) (describing *Solid Waste* as "a narrow holding" limited to the Migratory Bird Rule and not affecting regulations defining "non-navigable tributaries and streams" as "waters of the United States"); *Aiello v. Town of Brookhaven*, 136 F.Supp.2d 81, 119 (E.D.N.Y.2001) (holding that "non-navigable tributaries of navigable waters [are] waters of the United States under the CWA").

Defendant argues Salado Creek cannot be a "navigable water" because it flows through an underground pipeline on its way to the San Joaquin River. *See* Doc.43 at pp.25–26. In *Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir.2001), the Fifth Circuit held that discharges of oil onto land surrounding a seasonal creek did not implicate any "navigable water." *See Rice*, 250 F.3d at 272. Defendant notes that in *Rice* "[t]here [was] no detailed information about how often the creek runs, about how much water flows through it when it runs, or about whether the creek ever flows directly (above ground) into the

Canadian River." *Rice*, 250 F.3d at 270–71. Defendant argues the facts of *Rice* are closer to this case than are the facts of *Headwaters*. *See* Doc.43 at pp.25–26.

In *Rice*, there was no evidence of any discharge into any surface water; the allegation was that oil seeped into the ground, mixed with groundwater, and then made its way into several bodies of surface water. *See Rice*, 250 F.3d at 270. Here there is evidence in the form of elevated turbidity levels of discharge directly into surface waters. Plaintiff alleges Defendant has and continues to discharge material directly into navigable waters; no complicated path involving groundwater is alleged as it was in *Rice*. The nature of the pollutant involved here, sediment, precludes the kind of circuitous seepage route alleged in *Rice*. The fact that the waters of Salado Creek flow underground, partially through a pipe, does not make them "groundwater" outside the jurisdiction of the Act.[8] Unlike *Rice* where there was no clear evidence of a hydrological connection between the groundwater and the river, *see Rice*, 250 F.3d at 272, here there is no dispute that when there is sufficient water in Salado Creek it flows into the San Joaquin River. *See* Doc.60 at p.4:21–25. The fact that an underground pipeline conveys the water from one point to the other does not create a hydrological disconnect; nor does it affect Salado Creek's status as a tributary of the San Joaquin River. Salado Creek is not the kind of "isolated water" at issue in *Solid Waste* and *Rice;* it is a tributary hydrologically connected to the San Joaquin River, a navigable-in-fact body of water. *See* Doc.65 at ¶¶ 7–8, 14; Doc.62, Exh.F, Encl.1 at 7; Doc.60 at p.4:21–25; Doc.46 at ¶¶ 8–10.

The undisputed evidence demonstrates that Salado Creek is a tributary of the San Joaquin River, a navigable-in-fact waterway. As a tributary of an actually navigable waterway, Salado Creek is itself a "navigable water of the United States" within the meaning of the Act. Defendant's motion for summary judgment on the ground that Salado Creek is not a navigable water is DENIED. Plaintiff's motion for partial summary judgment on the issue of Salado Creek's status as a "navigable water" under the Act is GRANTED.

### E. *Discharge in Violation of the Act*

The Clean Water Act defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14). "The term 'pollutant' means dredged spoil, solid waste, . . . biological materials, . . . rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). EPA regulations specify that "discharge of a pollutant" includes "additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man." 40 C.F.R. § 122.2.

Defendant argues Plaintiff produces no evidence Defendant has caused the unau-

---

**8.** Even if the underground portion of Salado Creek were characterized as "groundwater," that fact alone would not prevent the water from being a "navigable water" under the Clean Water Act. *See, e.g., Bosma,* 143

F.Supp.2d at 1180 ("the CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States").

thorized "discharge of a pollutant," *i.e.* has not collected or channeled surface runoff. *See* Doc.43 at p.20:8–18. Defendant contends Plaintiff does not identify a "point source" from which any pollutants were discharged. *See id.* at p.21:19. Defendant argues Plaintiff's allegation that the location of the discharge is the portion of Salado Creek in the vicinity of Diablo Grande's existing facilities does not identify a point source. *See id.* at pp.21–23. Defendant contends Plaintiff "cannot *prove* Diablo Grande caused an on-going discharge from a particular point source to a navigable water" and therefore "cannot prove that Diablo Grande violated the Clean Water Act." Doc.43 at p.23:11–13.

■ "Since October 1, 1992, when the NPDES permit system took effect, NPDES permits have been required for storm water discharges from 'construction activity.'" *Na Mamo O 'Aha'ino v. Galiher*, 28 F.Supp.2d 1258, 1261 (D.Haw. 1998). "Construction, as described in 40 C.F.R. § 122.26(b)(14)(x),[9] is a point source activity." *Id.* Defendant's development of well over five acres of the Property is "construction activity" not within the agricultural, silvicultural, or any other exception to the permit requirements or point source definition. *Cf. id.* By identifying Defendant's construction activity on the Property, Plaintiff has sufficiently identified a "point source."

Defendant argues Plaintiff's allegations imply the discharge of a pollutant occurs under the Act whenever the flow in a creek stirs up pollutants already in the creek. *See* Doc.43 at p.23 (citing *Froebel v. Meyer*, 217 F.3d 928, 938 (7th Cir.2000)); *see also* Doc.43 at p.23:19–22 (citing *Nat'l*

*Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 585–86 (6th Cir.1988)). While *Froebel* suggests violations of the Act cannot result from purely passive activity, it makes clear that the active moving of earth may be sufficient to trigger liability under the Act. *See Froebel*, 217 F.3d at 939 ("If the county were to pile silt on the riverbank and deliberately allow rainfall to wash it into the stream, then Section 404 [of the Act] might become relevant.").

■ Defendant acknowledges the Property's golf course complex has many storm water inlets to convey water off of the Parkway, some of which "release storm water directly into Salado Creek." Doc.43 at p.22:13. "Many of these water drainage structures could be point sources under the Clean Water Act." *Id.* at p.22:14–15. The construction project (which, as discussed, is itself a single point source) and the other individual point sources within it were designed and installed by Defendant, not as a result of Defendant's role as a passive landowner. Plaintiff alleges Defendant has violated and continues to violate the Act because of its activities in developing its Property. Defendant's own expert admits that some sediment has been discharged into Salado Creek from Defendant's development as a result of Defendant's construction activities. *See* Doc.62, Exh. D. Plaintiff's evidence shows that Defendant's construction activity, not only acts of nature occurring in the face of Defendant's passivity, have likely caused and continue to cause discharges of sediment and settleable solids in violation of the Act, even if the exact

9. "Storm water discharge associated with industrial activity" includes:
    Construction activity including clearing, grading and excavation, except operations that result in the disturbance of less than five acres of total land area. Construction activity also includes the disturbance of less than five acres of total land area that is a part of a larger common plan of development or sale if the larger common plan will ultimately disturb five acres or more.
    40 C.F.R. § 122.26(b)(14)(x).

nature and extent of the discharge has not yet been quantified. *See, e.g.,* Lee's Decl; *see also Molokai Chamber of Commerce v. Kukui (Molokai), Inc.,* 891 F.Supp. 1389, 1401 (D.Haw.1995) (noting that construction activity involving the movement of earth creates circumstances where rain can cause polluting runoff that "continues to pollute until the violative earthwork construction is corrected").

At the summary judgment stage, Plaintiff need not "prove that Diablo Grande violated the Clean Water Act." Doc.43 at p.23:11–13. Instead Plaintiff "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P 56(e). Plaintiff produces evidence from which a reasonable trier of fact could find that Defendant has discharged and continues to discharge sediment, a pollutant, into Salado Creek, a navigable water. By identifying Defendant's construction activity as a source of the discharge, Plaintiff has adequately specified a "point source" within the meaning of the Act. Defendant's motion for summary judgment on the ground Plaintiff fails to identify a point source or produce evidence of the discharge of a pollutant into a navigable water is DENIED.

### F. *Whether Discharge was Authorized by the General Permit*

Defendant asserts Plaintiff fails "to identify a single site-specific erosion control measure that it believes Diablo Grande must implement under the Clean Water Act and the General Permit." Doc.43 at p.30:3–5. Defendant provides a list of erosion control measures it has implemented since the California Water Resources Control Board adopted the 1999 General Permit. *See id.* at pp.28:17–p.29:17. Defendant asserts Plaintiff provides a "laundry list of erosion control best management practices [10] that it contends Diablo Grande should implement *without saying where they should be implemented.*" *Id.* at p.30:8–10. Defendant argues Plaintiff does not offer concrete evidence that Defendant's erosion control measures are inadequate. *See id.* at p.30:20–22.

Defendant's contention that Plaintiff bears the burden of designing site-specific remedial measures to bring Defendant into compliance with the Act fails. *See* Doc.43 at p.30:22–24. The permitee, Defendant here, bears the burden of complying with the General Permit. There is no requirement in the Act that citizen suits for violations of the Act may not be maintained without the Plaintiff's specifically indicating what measures need to be taken to guarantee compliance with the Act. Leonilo Sarmiento of the CRWQCB explained that "[i]t's up to [the permitee] to implement effective BMP's in order to control erosion and sediment control." Doc.62, Exh.Q at p.52:16–17. Plaintiff produces evidence that creates a genuine issue of material fact as to whether Defendant discharged a pollutant and failed to comply with the terms of the General Permit in violation of the Act.

Defendant's argument that Plaintiff fails to identify specific locations where erosion control BMPs should be implemented does not demonstrate that the discharges of sediment and other alleged violations of the Act for which Plaintiff has produced evidence, did not occur or were authorized by the General Permit. Defendant's mo-

---

**10.** Best Management Practices, or BMPs, are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of "waters of the United States." BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.

40 C.F.R. § 122.2.

tion for summary judgment on the ground that its alleged discharges were authorized by the permit and its erosion control measures were BMPs is DENIED.

### G. *Evidentiary Objections*

Defendant objects to evidence submitted by Plaintiff. *See* Doc.83. The objections to documents relied upon in this decision have been fully considered. The evidence relied upon by this decision is admissible for deciding this summary judgment motion. To the extent objections are made to evidence not relied upon in this decision, those objections are moot.

### V. *CONCLUSION*

Defendant's motion for summary judgment is DENIED. Plaintiff's motion for partial summary judgment on the issues of standing, jurisdiction, and Salado Creek's status as a navigable water is GRANTED. Within five (5) days following service of this decision, Plaintiff shall submit an order that conforms with this decision.

SO ORDERED.